SUPREME JUDICIAL COURT 
 
 TOWN OF CONCORD vs. NEIL E. RASMUSSEN & others[1]

 
 Docket:
 SJC-13721
 
 
 Dates:
 May 7, 2025 – August 15, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Dewar, & Wolohojian, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Way, Public: what constitutes, establishment, access, discontinuance; Private. Statute, Construction. County, Commissioners.
 
 

       Civil action commenced in the Land Court
Department on October 24, 2017.
      The case was heard by Howard P. Speicher,
J.
      After review by the Appeals Court, 104
Mass. App. Ct. 831 (2024), the Supreme Judicial Court granted leave to obtain
further appellate review.
      Gwen Nolan King (Lisa C. Goodheart &
Dylan S. O'Sullivan also present) for the defendants.
      Austin P. Anderson (Melissa C. Allison
also present) for the plaintiff.
      The following submitted briefs for amici
curiae:
      Adam B. Ames, pro se.
      Peter F. Durning & Peter M. Vetere for
Trust for Public Land.
      Christopher J. Donnelly & Robert A.
DiSorbo for Holly M. Salemy & others.
      Christine P. O'Connor, Town Counsel, for
town of North Andover & others.
      Nicholas P. Shapiro, Joseph F. Konopka,
& Miranda P. Cecil for Real Estate Bar Association for Massachusetts, Inc.,
& another.
      Heather M. Gamache for Massachusetts
Association of Land Surveyors and Civil Engineers.
      KAFKER, J. 
We proceed here in the footsteps of the naturalist and philosopher,
Henry David Thoreau, along a road and route he described as follows:
"What shall
this great wild tract over which we strolled be called?  Many farmers have pastures there, and
wood-lots, and orchards. . . . 
The old Carlisle road, which runs through the middle of it, is bordered
on each side with wild apple pastures, where the trees stand without order
. . . .  It is a paradise
for walkers in the fall. . . . 
Shall we call it the Easterbrooks Country?"
H.D. Thoreau, The
Journal of Henry D. Thoreau 238 (B. Torrey & F.H. Allen eds., 1962).
      Public access to a disputed portion of the
"old Carlisle road," now known as Estabrook Road (road), is at the
center of the case before us.2  We
consider the road in three contiguous parts: 
(1) the northern disputed section, which the parties agree was the
subject of county layout proceedings in 1763; (2) the southern disputed
section, for which no formal layout documents have been discovered; and (3) an
undisputed section that continues south towards Concord Center.
      Landowners whose property abuts the road
(abutters) sought to bar the public from entering the disputed sections of the
road, to which they contend the public has no right of access or travel.  The abutters argue, first, that there is
insufficient evidence to conclude that the southern disputed section of the
road was ever made a public way.  Second,
the abutters contend that when the road was discontinued by the Middlesex
county commissioners (county commissioners) in 1932 pursuant to G. L.
c. 82, § 32A (§ 32A), the public lost any right to enter the
resulting "private way."  In
response, the town of Concord (town) argues that the disputed sections of the
road constituted a public way, and that when the road was discontinued in 1932,
the adjudication as a "private way" served only to terminate the
town's obligation to maintain the road and did not extinguish the right of the
public to use the road.  A Land Court
judge ruled in favor of the town, as did the Appeals Court, and we allowed the
abutters' application for further appellate review.
      We hold that the Land Court judge did not
abuse his discretion in finding that the disputed portion of the road was made
a public way by 1763 and hold that the discontinuance under § 32A
terminated the town's maintenance obligation but left the public's rights
undisturbed.[3]
      1. 
Factual background.  We briefly
summarize the facts as found by the Land Court judge, reserving certain facts
for later discussion.
      The portion of Estabrook Road in dispute
is an unpaved, thirty-foot wide road running for approximately 1.8 miles
north-south in Concord.  Bounded by
centuries-old stone walls, the road passes by the remnants of colonial-era
homesteads (including the Kibbe or Kibby place and the Estabrook place),
pastures, and a limestone kiln and quarry. 
Proceeding south towards Concord Center it passes wetlands and Mink Pond
(formerly Oak Meadow), before connecting to the paved portion of Estabrook Road
not in dispute.  Title to the lands along
the disputed stretch of the road is held by individual landowners, land trusts,
and Harvard College.
      The disputed portion of Estabrook Road was
laid out in two parts.  The northern
disputed section, from the town border with Carlisle to the southern end of
Mink Pond, was laid out by the county authority in 1763 in response to a
petition by abutting residents who sought a more direct route south to the
center of Concord.  The layout of the
northern disputed section accomplished this goal, because at its southern end
it connected to an already-existing "Town Way" -- the southern
disputed section of Estabrook Road.  The
southern disputed section, which runs from Mink Pond south to the undisputed
portion of Estabrook Road, had been laid out at some point prior to the
northern disputed section, although the exact date is unknown, as actual
records of the layout are lost.
      From the late Eighteenth Century to the
early Twentieth Century, the road was used by the public to travel between what
is now Carlisle and Concord Center.  At
times the road saw commercial use, including for hauling limestone and
timber.  The public also used it for
recreation.  Thoreau's commendation of
the road as a "paradise for walkers" was echoed by Ellen Tucker
Emerson, daughter of Ralph Waldo Emerson, who wrote in 1886 that she found
picnicking along the road to be "the greatest pleasure imaginable," 2
E.T. Emerson, The Letters of Ellen Tucker Emerson 572-573 (E.E.W. Gregg ed.,
1982), and by an 1897 travel guide, which described Estabrook Road as "one
of the favorite summer drives."  The
founder of the Massachusetts Audubon Society, William Brewster, also recorded
two trips on Estabrook Road in 1892, one a wintertime sled ride to the lime
kiln and the other a spring visit to collect plants.  There was evidence that the town maintained
the road during this period, albeit intermittently, and even improved it,
voting to install signage in 1888 and telephone poles in 1899.  An 1890 report by the town's road commissioners,
however, suggested that the cost to maintain the road was not justified by the
use it saw.
      In 1932, individuals whose property
abutted the road requested that the town's road commissioners petition the
county commissioners to "clos[e]" the road "as a public
way" because "the road is now almost impassable and is used only by
picknickers and is a serious fire hazard." 
The road commissioners agreed and stated the following in their petition
to the county commissioners:
"[T]hat they
are the duly elected and acting [r]oad [c]ommissioners of the [town]
. . . , and have charge of the public ways therein; that Estabrook
Road, so-called, in said [town], is a public way, and that common convenience
and necessity no longer require that such way shall be maintained in a
condition reasonably safe and convenient for travel . . . ; that said
way . . . has for a long period ceased to be in general public use;
that there are no residences served by that portion of said way sought to be discontinued
as a public way; and that it would be an inordinate and unreasonable expense
upon the said [town] to keep said way in a condition reasonably safe and
convenient for travel."
In response, the
county commissioners "adjudicate[d] that said way [should] [t]hereafter be
a private way, and that the town [should] no longer be bound to keep the same
in repair," provided that "sufficient notices to warn the public
against entering on said way [were] posted" pursuant to G. L.
c. 82, § 32A, inserted by St. 1924, c. 289.
      2. 
Procedural history.  On October
24, 2017, the town filed a complaint against the abutters seeking a judgment
declaring that the public had access and use rights to the road, regulated by
the town,[4] and a permanent injunction preventing the abutters from
interfering with the public's access.
      In April 2020, while the action was
pending, four of the abutters locked a gate they had previously erected at the
southern end of the disputed portion of the road and another gate three hundred
yards to the north, thereby closing off the portion of the road abutting their
two properties to the public.  The four
abutters cited increased usage during the coronavirus lockdown and unsafe
behavior by some road users.  They also
posted signs at both gates stating that the road was private, one of which
stated that the road was closed "by order of [c]ounty
[c]ommissioners."  In response, the
town moved for a preliminary injunction. 
After a hearing by video conference, the Land Court judge allowed the
town's motion.
      The Land Court judge held a six-day bench
trial by Zoom (an online video conferencing platform) and ultimately entered
judgment for the town.  In a detailed,
eighty-five—page decision, he found that the northern disputed section was laid
out in 1763 by the Middlesex County Court of General Sessions of the Peace, and
that circumstantial evidence showed that the southern section had been laid out
at some point prior to the northern section, although the records had been
lost.  The Land Court judge also concluded
that the 1932 discontinuance terminated the town's obligation to maintain the
road in a condition reasonably safe and convenient for travel but did not
affect the public's rights to use the road.
      The abutters appealed, and this court
denied their application for direct appellate review.  The Appeals Court affirmed the judgment after
modifying it "to declare that the disputed northern and southern sections
of Estabrook Road were laid out as a public way prior to 1932 and that the 1932
order of the county commissioners did not terminate the public's access to the
disputed sections of the road." 
Concord v. Rasmussen, 104 Mass. App. Ct. 831, 842-843 (2024).  The abutters sought further appellate review,
which we granted.
      3. 
Discussion.  The abutters raise
two principal arguments before us. 
First, they contend that the Land Court judge erred in concluding that
the disputed portion of Estabrook Road was ever a public way.  Second, they argue that, even assuming it was
a public way, the 1932 adjudication by the county commissioners extinguished
the general public's right of access.  We
address each argument in turn, reviewing the Land Court judge's conclusions of
law de novo, while leaving his factual findings undisturbed unless they are
clearly erroneous.  See Nylander v.
Potter, 423 Mass. 158, 159 n.5 (1996).
      a. 
Status of disputed land prior to 1932. 
Our law recognizes three means of creating a public way:  (1) layout by a public authority in accordance
with statute,5 (2) prescription, and (3) if done before the method was
abolished in 1846, dedication and acceptance. 
See G. L. c. 82, §§ 1-32; Loriol v. Keene, 343 Mass. 358,
360 (1961); Carson v. Brady, 329 Mass. 36, 39-41 (1952).  "Once duly laid out, a public way
continues to be such until legally discontinued."  Carmel v. Baillargeon, 21 Mass. App. Ct. 426,
428 (1986), citing Preston v. Newton, 213 Mass. 483, 485 (1913).  The party claiming the existence of a public
way -- here, the town -- bears the burden of proof, and whether that party has
met that burden is a question of fact to be resolved by the fact finder.  See Clark v. Hull, 184 Mass. 164, 166 (1903).
      The Land Court judge found that the entire
disputed portion of the road had been properly laid out as a public way, albeit
in two different stages.  He determined
that the northern portion of the road, from the Concord-Carlisle border to the
southern end of Mink Pond, was laid out in 1763 in response to a petition by
abutters, who sought a more convenient route to Concord Center to the
south.  This finding was supported by
contemporaneous records from the county and town documenting the process of
laying out the road; the county's records describe this northern portion as
terminating at "a Town Way." 
In addition to this direct evidence, the judge also relied on various
forms of circumstantial evidence -- among them, town payment records, surveyor
assignments, town meeting warrants, and testamentary and conveyancing
instruments -- in finding that the layout lawfully complied with required
conditions.[6]
      The Land Court judge made separate
findings on the laying out of the southern disputed portion of the road, which
runs from the end of the northern disputed section (at the southern end of Mink
Pond) south to the intersection with the paved, undisputed section of Estabrook
Road.  Crediting testimony from the
town's clerk, the judge found that, beginning in 1654, layout records for that
part of Concord would have been kept in a specific "North Quarter
book."  That book could not be
located at the time of trial, meaning that any direct evidence expressly
documenting the laying out of this southern portion of Estabrook Road had been
lost.  Nevertheless, the judge found that
the laying out of the southern disputed section as a public way had occurred,
relying on a collection of circumstantial evidence:  (1) the reference in the 1763 layout
documents to the already-existing "Town Way" connecting to the
northern portion of the road; (2) the evidence of the road's physical condition
in the 1700s, "which was conducive to travel in comparison to alternate
neighboring trails"; (3) the town's assignment of surveyors to maintain
the southern disputed portion of the road as early as 1757; (4) use of the road
by the general public for well over a century; and (5) the fact that Estabrook
Road, including the southern disputed portion, was the subject of the 1932
adjudication by the county commissioners, which would have had no effect on a
purely private way.
      In so concluding the judge relied on a
discussion in Fenn v. Middleborough, [7] Mass. App. Ct. 80, 87 (1979), wherein
the Appeals Court recited, albeit in dictum, that it could find "no
principle which would bar the proving of a public way on [only circumstantial]
evidence."  The abutters now contend
that the Fenn court was incorrect, and that the Land Court judge could not have
found the southern disputed portion of the way to be public without direct
evidence of its layout.  We disagree.
      As a general matter, our law permits facts
to be proved by circumstantial evidence in all manner of cases.  See, e.g., Adams v. Schneider Elec. USA, 492
Mass. 271, 280-281 (2023) (circumstantial evidence sufficient to prove
employment discrimination); Commonwealth v. Bush, 427 Mass. 26, 30 (1998)
("circumstantial evidence is competent to establish guilt beyond a
reasonable doubt"); White v. Loring, 24 Pick. 319, 322 (1837) (contents of
deed "may be proved . . . by circumstantial
evidence").  Proof of a public way
is no exception, as shown in a number of our historical cases, and one modern
Appeals Court case, on the subject.7 
See, e.g., Reed v. Mayo, 220 Mass. 565, 568 (1915) (affirming Land Court
judge's finding that way was public "[e]ven though evidence of notice and
filing does not appear in the town records"); Commonwealth v. Matthews,
122 Mass. 60, 63-64 (1877); Commonwealth v. Belding, 13 Met. 10, 16 (1847)
("with the proper evidence it would seem reasonable that a town way might
be shown, as well as a public highway, without, in all cases, producing a
record of its establishment as a town way"); Martin v. Building Inspector
of Freetown, 38 Mass. App. Ct. 509, 511-512 (1995).
      Allowing such proof makes eminent sense,
given that direct layout records may be lost to time, as in the instant case,
or destroyed, as occurred, for example, when the Barnstable County registry of
deeds burned in 1827.  See Harvey v.
Sandwich, 256 Mass. 379, 383 (1926) ("Due perhaps to the fact that the
registry of deeds of Barnstable County was destroyed by fire in 1827, there are
no records of deeds prior to 1827 through which the ownership of the locus can
be traced until that date . . .").  Accident or misfortune cannot be allowed to
serve as a complete bar to proof of layout. 
We therefore do not require, as a matter of law, direct evidence
documenting that a public way was laid out.[8]
      Of course, the circumstantial evidence
must still be sufficient for a fact finder to conclude that it was more likely
than not that a public way was properly laid out.  As the abutters correctly note, some types of
circumstantial evidence may be individually insufficient.  For example, both public and private ways
alike can be kept in good physical condition and used by the public; such facts
alone do not justify finding a public way. 
See Fenn, 7 Mass. App. Ct. at 85-86. 
Likewise, we have held that, standing alone, the acts of surveyors in
maintaining a road are not enough to prove that it was established as
public.  See Reed v. Scituate, 5 Allen
120, 123-124 (1862).  See also Teague v.
Boston, 278 Mass. 305, 308 (1932) (city maintenance of utilities not sufficient
alone to prove way was public); Witteveld v. Haverhill, 12 Mass. App. Ct. 876,
876 (1981) (discontinuance vote did not compel inference that way had been
public).
      But here those facts do not stand
alone.  After observing six days of
testimony, considering one hundred thirty-seven exhibits, and taking two views,
the Land Court judge made detailed subsidiary findings regarding, among other
things, the loss of direct records of layout, the reference to the road as a
public way in contemporaneous town records, the town's undertaking of
maintenance obligations and improvements, the use and physical character of the
road, and the fact that the road was subject to the 1932 discontinuance
proceedings.[9]  Then, considering these
facts in light of the entire body of evidence, he found that it was more likely
than not that the disputed portion of Estabrook Road had been laid out as a
public way.  "In view of all the
facts . . . we cannot say that the judge of the Land Court was wrong
in [so] finding."[10]  Reed, 220
Mass. at 568 (finding supported by "the records, the construction of the
road and its long user, the occasional repairs, and other circumstances tending
to show that Mayo Road originally was laid out as a town way").  See Martin, 38 Mass. App. Ct. at 511
(affirming finding that public way was properly laid out as public based on
minutes of town meeting, ancient and modern maps, testimony of surveyor and
historian, and view).[11]  That the
evidence may also have permitted a contrary inference, as the abutters argue,
does not render the finding clearly erroneous. 
See Matulewicz v. Planning Bd. of Norfolk, 438 Mass. 37, 43 (2002)
(judge's factual finding regarding status of way "seals the fate" of
argument that she should have viewed evidence differently); Martin, supra at
512 ("To be sure, there was evidence from which different and possibly
contrary inferences could be drawn. 
Resolution of conflicting tendencies in the evidence, however, was for
the judge . . .").
      b. 
Effect of the 1932 adjudication. 
We now turn to the adjudication by the county commissioners in 1932 and
its effect on the rights of the public. 
The abutters argue that when the road was adjudicated a "private
way" under G. L. c. 82, § 32A, inserted by St. 1924,
c. 289, it extinguished both the town's maintenance obligations and any
extant rights of the general public to access the road.  The town, on the other hand, contends that
such an adjudication terminates only the town's obligation to maintain the road
and leaves the public's rights undisturbed. 
The effect of the adjudication under § 32A presents a question of
statutory interpretation that we review de novo.  See Plymouth Retirement Bd. v. Contributory
Retirement Appeal Bd., 483 Mass. 600, 603-604 (2019).
      "When interpreting a statute, our
primary duty is to 'effectuate the intent of the Legislature in enacting
it.'" Wallace W. v. Commonwealth, 482 Mass. 789, 793 (2019), quoting
Matter of E.C., 479 Mass. 113, 118 (2018). 
"To that end, we begin with the statutory language," but
"also consider the cause of [the statute's] enactment, the mischief or
imperfection to be remedied and the main object to be accomplished"
(quotation and citation omitted).  Wallace W., supra.  In so doing, "we look not only to the
specific words at issue but also to other sections [of the statute], and
'construe them together . . . so as to constitute an harmonious whole
consistent with the legislative purpose.'" 
Malloy v. Department of Correction, 487 Mass. 482, 496 (2021), quoting
Pentucket Manor Chronic Hosp., Inc. v. Rate Setting Comm'n, 394 Mass. 233, 240
(1985).
      Based on these rules of statutory
construction, we conclude that an adjudication under § 32A does not eliminate
public access.  It simply removes the
requirement that the town maintain the road.
      The text of § 32A in place when the
petition was brought in 1932 provides:
"Upon
petition in writing of the board or officers of a town having charge of a public
way, the county commissioners may, whenever common convenience and necessity no
longer require such way to be maintained in a condition reasonably safe and
convenient for travel, adjudicate that said way shall thereafter be a private
way and that the town shall no longer be bound to keep the same in repair, and
thereupon such adjudication shall take effect; provided, that sufficient notice
to warn the public against entering thereon is posted where such way enters
upon or unites with an existing public way. 
This section shall not apply to ways in cities."  (Emphasis added.)
St. 1924,
c. 289, inserting G. L. c. 82, § 32A.
      Unfortunately, the statute in effect in
1932 does not define "private way," and the words, which have a long
history dating back to colonial times, are "susceptible of different
meanings."  Opinion of the Justices,
313 Mass. 779, 781 (1943).  See United
States v. 125.07 Acres of Land, More or Less, 707 F.2d 11, 14 (1st Cir. 1983)
(125.07 Acres of Land).  Nonetheless, in
an Opinion of the Justices, supra at 782, issued in 1943, we provided further
guidance and, citing this statute, explained:
"Although
the words 'private ways' may occasionally be used in the statutes with a
different meaning, . . . they commonly mean ways of a special type
laid out by public authority for the use of the public.  Such 'private ways' are private only in name,
but are in all other respects public." 
(Quotation and citations omitted.)
See Butchers'
Slaughtering & Melting Ass'n v. Boston, 139 Mass. 290, 291 (1885)
(distinction between highways and town ways or private ways rests "in the
fact that the former are laid out . . . by the authorities having
jurisdiction throughout the county, . . . while the latter are laid
out . . . by the selectmen, with the approval of the town.  In other respects they are alike, and equally
parts of the system of public ways" [emphasis added]); 125.07 Acres of
Land, supra (describing three kinds of public ways, including highways, town
ways, and private ways necessary for access that were laid out by town, and all
of which are "public in the sense of providing access").  See also Black's Law Dictionary 1223-1224 (2d
ed. 1910) (defining "private way" as "[a] right which a person
has of passing over the land of another" or "[chiefly in New England]
. . . one laid out by the local public authorities for the
accommodation of individuals and wholly or chiefly at their expense, but not
restricted to their exclusive use, being subject, like highways, to the public
easement of passage"); Black's Law Dictionary 1838 (3d ed. 1933) (same).
      Our conclusion that the reference to
private way in the version of § 32A in effect in 1932 refers to a type of
private way that retains public access is consistently supported by the case law.  In Coombs v. Selectmen of Deerfield, 26 Mass.
App. Ct. 379, 381 (1988), the Appeals court stated that "a natural reading
of the pre-1983 statute [that was the one in effect at the time of the 1932
discontinuance] . . . eliminat[es] the expense of the town's burden
of maintenance, while leaving unimpaired the public's right of access over the
road."  And in Nylander, 423 Mass.
at 161 n.7, this court, relying on Coombs, explained that a discontinuance
under the 1983 amendment of § 32A "merely relieves a municipality of
liability for care and maintenance of the road" but "does not
extinguish the right of the public, and abutting landowners, to travel over the
road."
      This consistent interpretation is well
supported because we, rejecting the argument of the abutters, conclude that the
1983 rewriting of this provision reflects a clarification and not a substantive
change with respect to the meaning of "private way."  See Weston v. Maguire, 10 Mass. App. Ct. 540,
542 (1980) ("In appropriate circumstances a court may resort to the
subsequent act of a Legislature for discovery of the legislative intent in a
preexisting statute").  The amended
provision provides, in relevant part:
"The board
or officers of a city or town having charge of a public way may, after holding
a public hearing . . . upon finding that a city or town way or public
way has become abandoned and unused for ordinary travel and that the common
convenience and necessity no longer requires said town way or public way to be
maintained in a condition reasonably safe and convenient for travel, shall
declare that the city or town shall no longer be bound to keep such way or
public way in repair and upon filing of such declaration with the city or town
clerk such declaration shall take effect, provided that sufficient notice to
warn the public against entering thereon is posted at both ends of such way or
public way, or portions thereof."
G. L.
c. 82, § 32A, as appearing in St. 1983, c. 136.  This provision, like its predecessor, is
focused on the process for discontinuing town maintenance of public ways.
      The removal of the reference to the term
"private way" thus appears to be in response to the confusion such
terminology may cause when referring to a way that retains public access.  See 125.07 Acres of Land, 707 F.2d at 14
(warning in 1983 decision of "the danger of making broad public/private
distinctions in this area" because "[t]erminology has changed over
the years").  By modernizing the
language, a historic understanding that a private way may retain public access
is not required.12  We therefore
interpret the 1983 amendment, entitled "An Act further regulating the
procedures for abandoning certain municipal ways," as merely clarifying and
modernizing, rather than changing the substance of, the provision in this
regard, and that, accordingly, the 1924 version should be understood to relieve
the town of maintenance obligations without altering the public's rights to the
resulting "private way."  See
Lincoln Pharmacy of Milford, Inc. v. Commissioner of the Div. of Unemployment
Assistance, 74 Mass. App. Ct. 428, 436 (2009), quoting DiMarzo v. American Mut.
Ins. Co., 389 Mass. 85, 103 (1983) ("It is not unusual for the Legislature
to amend a statute 'simply to clarify its meaning'").
      The consistent interpretation of
§ 32A, including our understanding that the 1983 amendment is a
clarification and not a change in the law, further undermines the abutters'
argument that public access is denied because notice must be posted "to
warn the public against entering thereon . . . where such way enters
upon or unites with an existing public way."  G. L. c. 82, § 32A, inserted
by St. 1924, c. 289.  The abutters'
argument is undercut by the retention of similar language in the version of
§ 32A amended in 1983, which, like the preamendment statute, has been
interpreted to terminate the town's maintenance obligations and attendant
liability but not diminish public access. 
See G. L. c. 82, § 32A, as appearing in St. 1983,
c. 136 ("provided that sufficient notice to warn the public against
entering thereon is posted at both ends of such way or public way, or portions
thereof"); Nylander, 423 Mass. at 161 n.7 (discontinuance under 1983
version of § 32A relieves municipality of liability for care and maintenance
but does not extinguish public access rights over road).  See also G. L. c. 84, § 24
(providing means of avoiding liability for safety risks on dedicated ways
because "otherwise the town shall be liable for damages arising from
defects therein as in the case of ways duly laid out and established"
[emphases added]).  Indeed, the text was
again amended, and its meaning further clarified, in 2006 from "warn[ing]
the public against entering thereupon" to "warn[ing] the public that
the way is no longer maintained." 
St. 2006, c. 336, §§ 29, 30. 
For all these reasons, we conclude that this warning against entering is
designed to protect the town from liability, not prevent public access.
      We also conclude that the town's, and not
the abutters', reading of § 32A is compatible with the broader statutory
scheme, particularly the difference between G. L. c. 82, § 21
(§ 21) and § 32A.  In contrast
to an adjudication under § 32A, a legal discontinuance of a town way or
private way by town vote under § 21 extinguishes not only a town's
maintenance responsibility, but also the right of the public and abutting
landowners to travel over the road.  See
Nylander, 423 Mass. at 161 n.7 ("A legal discontinuance, by town vote, of
a road as a public way is to be distinguished from a discontinuance of
maintenance under G. L. c. 82, § 32A [1994 ed.]");
Mahan v. Rockport, 287 Mass. 34, 37 (1934) ("A town way may be
discontinued by vote of the town and not otherwise.  G. L. [Ter. Ed.] c. 82,
§ 21"); Stone v. Garcia, 15 Land Ct. Rep. 640, 642 n.6 (2007).[13]  Relatedly, the parties dispute the
significance of the statutory term "discontinuance" as applied to
§ 32A.  We are unpersuaded, however,
that the mere use of the term "discontinue" sheds any light on what
rights the public retains after a road is adjudicated a private way under
§ 32A.  As discussed, this court has
previously distinguished between a "legal discontinuance, by town
vote," under § 21, and a "discontinuance of maintenance"
under § 32A.  Nylander, 423 Mass. at
161 n.7.  That is, § 21 discontinues
public access altogether, and § 32A discontinues only the town's
maintenance obligations and any accompanying liability for failing to maintain
the road in a condition safe and convenient for travel.
      This distinction between a town vote under
§ 21, which extinguishes public access altogether, and an adjudication by
county commissioners under § 32A, which only ends the town's obligation to
maintain the road, reflects the significant differences in who is deciding and
what is being decided under §§ 21 and 32A. 
The town as a whole is the decision maker in § 21, while the county
commissioners -- or, subsequent to the 1983 amendment, other town or city
officials -- are the decision makers under § 32A.  All public access is being terminated by a
§ 21 proceeding while public maintenance alone is being discontinued under
§ 32A.  The public has more at stake
in a legal discontinuance under § 21 than in a mere discontinuance of
maintenance under § 32A.  Requiring
notice, a town meeting, and a town vote reflects the public's wider interest in
access -- as demonstrated by those desiring to walk along or preserve these
historic public paths -- and the democratic process required before that access
may be terminated.  See G. L. c. 82,
§ 21.
      We also conclude that this reading is
supported, and not undermined, by G. L. c. 82, § 30 (§ 30),
which allows the county commissioners to discontinue a town way or private way
"[u]pon the application in writing of a person aggrieved by the refusal of
a town to discontinue a town way or private way," only after a town
meeting.  A discontinuance under
§ 30 comes with additional requirements, including notice and
recognizance.  See G. L. c. 82,
§ 31.  Importantly, a town meeting
has already been held in these circumstances and the voices of those concerned
by the proposed change heard.  The
decision to override that refusal is a weighty one for county officials.
      We cannot therefore conclude that the
Legislature intended § 32A to achieve the same result as § 21 or
§ 30 -- the termination of public rights to use a road -- without engaging
in the democratic process outlined in § 21 or triggering the procedural
safeguards provided by § 30 at county-level, post-town meeting
proceedings.  See Plymouth Retirement
Bd., 483 Mass. at 605 ("'[c]ourts must look to the statutory scheme as a
whole' . . . so as 'to produce an internal consistency' within the
statute" [citations omitted]).
      We next briefly address concerns raised by
the abutters and amici about the practical implications of our decision.  The abutters argue that the interpretation of
§ 32A that we adopt here will be profoundly disruptive to property rights
in the Commonwealth.  We are not
persuaded.  The case law interpreting
§§ 21 and 32A has consistently distinguished between the discontinuance of
public access altogether and the discontinuance of public maintenance.  See Nylander, 423 Mass. at 161 n.7; Mahan,
287 Mass. at 37; Coombs, 26 Mass. App. Ct. at 381.  Mahan, supra, which stated that only a town
vote can discontinue public access, was decided almost a century ago.  Furthermore, in the event that town ways or
private ways are subject to dispute in the future, §§ 21 and 30 remain
available to landowners and towns wishing to extinguish public rights.[14]
      4. 
Conclusion.  We hold that the Land
Court judge did not err in finding that the way was publicly laid by 1763.  In addition, we hold that the 1932
discontinuance under § 32A, by which the road was adjudicated a
"private way," terminated the town's obligation to maintain the road
in a condition reasonably safe and convenient for travel but left the public's
right to the road undisturbed. 
Accordingly, we affirm the judgment as modified by the Appeals Court
"to declare that the disputed northern and southern sections of Estabrook
Road were laid out as a public way prior to 1932 and that the 1932 order of the
county commissioners did not terminate the public's access to the disputed
sections of the road."  Rasmussen,
104 Mass. App. Ct. at 842-843.
So ordered.

footnotes

[1] Anna
Rasmussen; Brooks S. Read; Susannah Kay; Russell Robb, III, Leslee Robb, and
Thomas Wray Falwell, trustees of the Pippin Tree Land Trust; and President and
Fellows of Harvard College.

[2] The Land
Court judge found that "Thoreau's description of a walk on the 'old
Carlisle road' . . . describes a walk on Estabrook Road
. . . with many of the same landmarks still evident today, including
the lime kiln, the limestone quarry, the Kibby (or Kibbe) place, and Oak
Meadow, which is now Mink Pond."

[3] We
acknowledge the amicus briefs submitted by Adam B. Ames; Trust for Public Land;
Holly M. Salemy, Musketaquid Sportsman's Club, Inc., Florence Aldrich-Bennett,
H. Larue Renfroe, Rashmi Vasudeva, 235 Hanover Street LLC, 247 Hanover Street
LLC, William T. Stinson, Susan L. Stinson, Allen-Chase Foundation, doing
business as Eaglebrook School, Dennis C. Roof, and Congregation Beth Elohim;
town of North Andover, Franklin Regional Council of Governments, Barnstable
County, Plymouth County, Berkshire Regional Planning Commission, and Central
Massachusetts Regional Planning Commission; Real Estate Bar Association for
Massachusetts, Inc., and the Abstract Club; and Massachusetts Association of Land
Surveyors and Civil Engineers.

[4] Initially,
the town argued that, in the alternative, the road had become public by
prescription and that the town had a prescriptive easement to use the road for
trail purposes.  Ultimately, the town elected
not to pursue this argument at trial.

[5] The current
statutes governing the laying out of public ways contain numerous
requirements.  See, e.g., G. L.
c. 82, § 1 (coordination with neighboring municipalities), § 22
(written notice by town to abutters), § 23 (filing of plan in town clerk's
office).  Their historical predecessors
had far fewer.  Chapter 6 of the Province
Laws of 1693-1694, for example, titled "An Act for highwayes,"
permitted town selectmen to lay out a public way simply upon a finding that
such was "thought necessary," so long as the town compensated anyone
harmed by the laying out; the requirement that the action be approved by the
town meeting was not added until 1727, see St. 1727-1728, c. 1, § 2.

[6] Specifically,
the laying out was conditioned on the abutters granting the land needed for the
road to the town.  At trial and before
the Appeals Court, the abutters argued that this condition was not satisfied,
and that the laying out was therefore invalid. 
They do not press that argument before us.

[7] Although not
cited by the parties, some of the few treatises on the law of roads and
highways posit that we abrogated these older cases in Loriol v. Keene, 343
Mass. 358 (1961).  Our opinion in Loriol
did highlight the importance of the post-1846 statutory requirements of giving
notice and filing a layout, but nowhere did we state that direct evidence of
compliance with the requirements was strictly necessary.  Rather, we held that there were numerous
infirmities with the plaintiff's position that a way was public:  that there was no evidence of any dedication
of the way, that a single ambiguous reference to a town vote was insufficient
evidence of the way's acceptance by the town, and that the Legislature did not
intend to cure these deficiencies via a special act.  Id. at 360-363.

[8] At times, the
Land Court judge and the abutters referred to proof of laying out as a public
way via circumstantial evidence as a "fourth method," alongside (1) laying
out in accordance with the statutory requirements, (2) prescription, and (3)
dedication.  See G. L. c. 82,
§§ 1-32.  We think this label is
inaccurate; reliance on circumstantial evidence is simply a means by which to
prove one of these three accepted methods of creating a public way, here layout
in accordance with the statutory requirements.

[9] As these
subsidiary findings all had support in the record, we reject the abutters'
challenges to them.  See Nylander, 423
Mass. at 159 n.5.

[10] Because we
find no error in the judge's conclusion that the disputed stretch of Estabrook
Road was properly laid out as a public way, we need not address his finding
that, in the alternative, a public way had been established by prescription.

[11] Contrast
Puffer v. Beverly, 345 Mass. 396, 399-400 (1963) (where existence of public way
was raised by reference in Seventeenth Century town records, affirming trial
judge's finding that no public way had been laid out given rough terrain, lack
of reference to way on maps, and lack of municipal maintenance over course of
centuries); Moncy v. Planning Bd. of Scituate, 50 Mass. App. Ct. 715, 717
(2001) (affirming finding that way was laid out as private in 1725 and finding
significant that there was no evidence town had expended any funding for
construction or maintenance of way, and that town had launched inquiry into
whether it even owned way in 1858).

[12] Letters sent
to the Governor's office during the lead up to the bill's enactment suggest as
much.  See Letter from Massachusetts
Municipal Association to the Governor's legislative office (May 17, 1983)
(stating that House Bill No. 6019 [Apr. 13, 1983] "simplifies and makes
more efficient the procedure by which a city or town can free itself from the
responsibility for maintaining unused public ways"); Letter from
Massachusetts Association of Conservation Commissions to Governor Michael S.
Dukakis (May 18, 1983) (stating that House Bill No. 6019 "would permit
towns to be relieved of the responsibility of maintaining certain town roads
without having received the approval of [c]ounty [c]ommissioners" and
towns had found "that the intervention of [c]ounty [c]ommissioners on this
matter has 'infused' politics in land use decisions where politics are
unnecessary").  The text of House
Bill No. 6019 was substantially similar to the language ultimately adopted
except that House Bill No. 6019 referred only to town officials, rather than
officials of cities or towns.

[13] The abutters
also argue that the purpose of § 32A is to preserve the rights of abutting
landowners, rather than the general public, to a road that has been adjudicated
a "private way" under § 32A. 
We are unpersuaded.  This
distinction is not drawn in G. L. c. 82 or the case law interpreting
it.  The abutters' reliance on Nylander
is misplaced, as Nylander expressly notes that a discontinuance under
§ 32A "does not extinguish the right of the public, and abutting
landowners, to travel over the road." 
Nylander, 423 Mass. at 161 n.7. 
That is, a discontinuance under § 32A does not preserve the rights
of abutting landowners alone.

[14] Finally, we
briefly dispose of the abutters' argument that the Land Court judge abused his
discretion by excluding the abutters' proffered evidence of other § 32A
discontinuances.  "[A] judge's
discretionary decision constitutes an abuse of discretion where we conclude the
judge made a clear error of judgment in weighing the factors relevant to the
decision such that the decision falls outside the range of reasonable
alternatives" (citation omitted). 
Luppold v. Hanlon, 495 Mass. 148, 154-155 (2025).
      Pretrial, the abutters offered evidence
concerning the status of other roads discontinued pursuant to § 32A in
Concord and nearby Acton.  The judge
allowed the town's motion to exclude this evidence, concluding that the
discontinuances were not contemporaneous with the 1932 discontinuance at issue
and equating the proffered examples to "cherry-picking, with no assurance
that the few examples . . . represent a consistent understanding of
the statute throughout the Commonwealth at or about the time of the adoption of
the 1924 Act."  At trial, the
abutters requested that the judge reconsider and submitted an offer of proof
arguing that admitting the evidence was justified because (1) the abutters had
confirmed that the four roads were the only roads in Concord discontinued under
the version of § 32A in effect in 1932, and the abutters no longer sought
to introduce evidence of roads in Acton, and (2) the town's theory of the case
had become more clear and would be contradicted by the evidence of how other
Concord roads had been treated by the same road commissioners involved in the
1932 discontinuance.  The judge denied
the motion to reconsider for failing to timely raise the issue when such
motions were being considered, months before trial.
      We discern no abuse of discretion, here,
where the judge determined that a subset of discontinuances from Concord and a
nearby town would not necessarily "represent a consistent understanding of
the statute throughout the Commonwealth at or about the time of [its]
adoption," and would significantly add to the already voluminous amount of
evidence being considered.